IN RE INTEREST OF JOSEPH S.,
A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE,
V. JOSEPH S., APPELLANT.
698 N.W.2d 212

Filed June 14, 2005.   Nos. A-04-989, A-04-1177.

Scott E. Sidwell, of Legal Aid of Nebraska, for appellant.

Michelle Sayers, Deputy Lancaster County Attorney, and Micah I. Shirts, Senior Certified Law Student, for appellee.

INBODY, Chief Judge, and SIEVERS and CASSEL, Judges.

CASSEL, Judge.

## INTRODUCTION

This case involves two appeals consolidated for our review: the appeal of an adjudication of Joseph S., a child under 18 years of age, pursuant to Neb. Rev. Stat. § 43-247(2) (Cum. Supp. 2002), for attempted possession of a destructive device and the appeal from a subsequent order entered while the adjudication was pending appeal. For the reasons set forth herein, we reverse, and remand with directions.

## BACKGROUND

In case No. A-04-989, the State filed a petition in the separate juvenile court of Lancaster County, Nebraska, on February 12, 2004, alleging that Joseph was a juvenile as defined by § 43-247(2) for the reason that on or about January 23, 2004, Joseph intentionally engaged in conduct which constituted a substantial step in a course of conduct intended to culminate in his commission of the crime of possession of a destructive device as defined in Neb. Rev. Stat. § 28-1213(7) (Cum. Supp. 2004), in violation of Neb. Rev. Stat. §§ 28-201 (Cum. Supp. 2004) and 28-1220(1) (Reissue 1995).

The juvenile court held an adjudication hearing on July 29, 2004. The parties stipulated to Joseph's date of birth, said date showing him to be under 18 years of age at the time of the hearing. Four male friends and schoolmates of Joseph, including Sean H. and Corey C., were with Joseph on the evening of January 23. After obtaining dry ice from a grocery store, acquiring plastic pop bottles from a recycling bin, and filling the bottles with water at the house of one of the boys, the boys proceeded in two cars to the open and unoccupied parking lot of a church located near 84th and Holdrege Streets in Lincoln, Nebraska, "[t]o do dry ice bombs." Though Joseph did not testify, the other boys each testified that they did not intend to use the dry ice bombs to harm any person or property and that the parking lot location was picked because it was in an area where no one would be disturbed and no property would be damaged. For example, Sean testified that they selected such location because "it'd be safe and it was an open space." Sean explained that by "safe," he meant that other people would not be around, "so no one else would get hurt," and that no property would be damaged.

When they arrived at the parking lot, Sean, Corey, and Joseph prepared to put dry ice in the bottles after dumping half the water out of each. Sean testified that after they had put the ice in one of the bottles and Joseph had put the cap on it, the boys "waited for it to explode and it didn't. So we moved it out of the way and then we got out another bottle and we — Corey, Jo[seph] and me put dry ice in it . . . except we didn't put the cap on." No explosions occurred. They did not "complete" the second bottle because a

police officer arrived. Sean testified, "We expected them to explode," and he explained that he and Joseph had "done it before."

At the adjudication hearing, a police officer testified that on the evening in question, he had happened upon the area of 84th and Holdrege Streets while doing routine checks of businesses and residences in the area. The officer described the location of the church as having a line of trees on the east side and an open field on the south side; he testified that the west side was just starting to be developed and that there was "still significant space between the church and the residences that [were] being built." While driving around the south side of the church, the officer had noticed in the parking lot a 2-liter pop bottle that was "smoking" and chunks of a white substance which he later determined to be dry ice. He did not see anyone in the area at that time. After parking his vehicle, advising dispatch of the situation, and checking a shed on the southeast corner of the parking lot, the officer noticed two occupied vehicles parked at the northeast corner of the church. The officer testified that after he had made contact with the occupants—the boys—one of them, Joseph, told him what the boys were doing and that the particular location was selected by them because "it was a remote location, away from the city, away from any type of property that can be damaged." The officer confirmed that no bottles had exploded.

A fire inspector for the city of Lincoln was dispatched to the area of 84th and Holdrege Streets on January 23, 2004, based upon the above-described incident involving dry ice. He testified that he there observed three "devices, one of which had" a cap screwed onto it and was larger than normal or misshapen. The inspector later fired a BB gun at that device but was unable to penetrate it. He testified that after he fired a pellet gun at it, "it jumped approximately ten foot" and "[i]t exploded in an upward manner." The inspector explained at the adjudication hearing that an explosion is caused when the dry ice releases some carbon dioxide gas and rapidly expands inside the vessel. He did not believe that dry ice was an incendiary device or an explosive by itself, but testified that the plastic bottle becomes a destructive device when the combination of certain amounts of water and dry ice is placed in the bottle and the bottle's cap is sealed

in place. The inspector testified that "[t]he only purpose for putting dry ice in water in a container like that and sealing it would [be] to make that thing go boom or to explode it, to detonate it, to make it disrupt."

The court overruled Joseph's motion to dismiss at the close of the State's evidence. The defense called as its only witness a biology science teacher employed by Lincoln Public Schools. The teacher testified that the chemical composition of dry ice is carbon dioxide and that dry ice "undergoes no chemical reaction because through the process of sublimation it goes from solid carbon dioxide to a gas." Joseph did not renew his motion to dismiss at the close of all the evidence.

In an order filed on August 3, 2004, the juvenile court found the allegations of the petition true beyond a reasonable doubt, adjudicated Joseph as a juvenile as defined by § 43-247(2), and set a date for disposition proceedings. Joseph filed an appeal on August 23.

Case No. A-04-1177 arises out of the September 15, 2004, proceedings scheduled by the juvenile court on August 3 and the order stemming from those proceedings. On September 15, the court held a hearing and noted, "[T]his matter is on appeal and as such the Court is not in a position to make disposition, but the Court can make interim orders. And the Court would look at making some interim orders." In its order of the same date, the court found that it would be in the best interests of Joseph for him to be placed on home detention in the custody of his parents pending resolution of the appeal. The court imposed conditions requiring, inter alia, that Joseph complete 10 hours of community service by January 1, 2005, and complete an education class through the Lincoln Fire Department on the potential dangers of explosive devices. The order stated that it would continue in full force and effect until the next hearing, on November 3, 2004. Joseph timely appealed.

## ASSIGNMENTS OF ERROR

Joseph asserts that the juvenile court erred (1) in overruling his motion to dismiss, (2) in finding that the device he was attempting to possess was a destructive device as defined and prohibited by statute, (3) in adjudicating him when such determination was

contrary to law and not supported by the evidence, and (4) in entering its "Order of Home Detention" while the adjudication appeal was pending in this court.

## STANDARD OF REVIEW

■ Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Joshua R. et al.*, 265 Neb. 374, 657 N.W.2d 209 (2003).

■ Statutory interpretation presents a question of law. *Mathews v. Mathews*, 267 Neb. 604, 676 N.W.2d 42 (2004). With regard to questions of law, the appellate court is obligated to reach a conclusion independent of the trial court's conclusion. See *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003).

## ANALYSIS

Because it is dispositive of the issues on appeal, we begin our analysis with an examination of the destructive device statute and a determination as to whether the facts of this case supported the adjudication. The pertinent part of § 28-1213 states:

(7)(a) Destructive devices shall mean:

(i) Any explosive, incendiary, chemical or biological poison, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, (F) booby trap, (G) Molotov cocktail, (H) bottle bomb, (I) vessel or container intentionally caused to rupture or mechanically explode by expanding pressure from any gas, acid, dry ice, or other chemical mixture, or (J) any similar device, the primary or common purpose of which is to explode and to be used as a weapon against any person or property; or

(ii) Any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subdivision (7)(a)(i) of this section from which a destructive device may be readily assembled.

(b) The term destructive device shall not include (i) any device which is neither designed nor redesigned for use as

a weapon to be used against person or property, (ii) any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line-throwing, safety, or similar device, (iii) surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to 10 U.S.C. 4684(2), 4685, or 4686, as such sections existed on July 20, 2002, (iv) any other device which the Nebraska State Patrol finds is not likely to be used as a weapon or is an antique, or (v) any other device possessed under circumstances negating an intent that the device be used as a weapon against any person or property.

■ Focusing primarily on the word "explosive" in § 28-1213(7)(a)(i), Joseph first argues that the dry ice bombs regarding which he was charged were not destructive devices because they did not incorporate any explosive, incendiary, chemical or biological poison, or poison gas. We disagree. The fire inspector and the science teacher each testified that dry ice and water individually are not explosive, incendiary, chemical or biological poisons, or poison gases. The teacher emphasized the absence of a chemical reaction in the process of sublimation, where dry ice goes from solid carbon dioxide to a gas. However, the inspector testified that "when you add the water and the dry ice combined, that all makes an explosive device." Statutory language is to be given its plain and ordinary meaning. *State v. Johnson*, 269 Neb. 507, 695 N.W.2d 165 (2005). Webster's Encyclopedic Unabridged Dictionary of the English Language 502 (1989) defines "explosive" as: "1. tending or serving to explode . . . 2. pertaining to or of the nature of an explosion . . . 4. an explosive agent or substance, as dynamite." (Emphasis omitted.) To the extent the Legislature categorized a dry ice bomb as an explosive, it obviously considered that term in its ordinary and plain meaning rather than a technical definition based upon the specific chemical process utilized. Indeed, the Legislature referred to a "container intentionally caused to . . . *mechanically explode* by expanding pressure from . . . dry ice." (Emphasis supplied.) § 28-1213(7)(a)(i)(I). By using the term "mechanically explode," the Legislature implicitly acknowledged that a dry ice device "explodes" without a chemical process.

Moreover, it appears that in 1999, when the Legislature thus amended § 28-1213(7)(a) (Reissue 1995), as it was then structured, the Legislature simply added "bottle bomb" and "vessel or container intentionally caused to rupture or mechanically explode by expanding pressure from any gas, acid, dry ice, or other chemical mixture" as additional items expressly defined as destructive devices. See § 28-1213 (Cum. Supp. 2000). The Legislature obviously considered such devices as "explosives" within the plain and ordinary meaning of the word.

A review of the legislative history supports our determination that the Legislature intended to include such "dry ice bombs" as destructive devices. The introducer of the legislation noted that the bill "adds to the definition of destructive devices" the two additional types of device and explained that the then-existing statute "does not specifically address the current trend of filling bottles with acids, gas, dry ice and other chemical mixtures to be used as a bomb." Introducer's Statement of Intent, L.B. 131, Judiciary Committee, 96th Leg., 1st Sess. (Feb. 17, 1999). In support of the bill, a captain with the Nebraska State Patrol testified:

> During the 1980s, there was a trend for pipe and liquid bombs that seemed to diminish. But today we're seeing a large increase in those types of bombs that include the liquid and gas bombings. Numerous cases are never investigated because there's no injury or damage. However, a time delay device that lies in a public area for a short period of time has devastating possibilities. For under about $5 and less than five minutes these small bombs are being constructed with enough force to blow a mailbox onto the roof of a residence.

Judiciary Committee Hearing, L.B. 131, 96th Leg., 1st Sess. 104 (Feb. 17, 1999).

Joseph next argues that the dry ice bombs in this case were excluded from being destructive devices under § 28-1213(7)(b) (Cum. Supp. 2004). Specifically, he argues that they were excluded under § 28-1213(7)(b)(i) as "any device which is neither designed nor redesigned for use as a weapon to be used against person or property" or § 28-1213(7)(b)(v) as "any other device possessed under circumstances negating an intent that the device be used as a weapon against any person or property." The

evidence is undisputed that Joseph and the other boys wanted to see whether the dry ice bombs would make "a boom sound" and burst the bottles and that the location at issue was chosen because it was an open space where no one would be injured and no property would be damaged. The State asserts that for policy reasons and based upon Nebraska case law, the dry ice bombs in this case did not fit within the above exceptions.

Although we find no Nebraska case law considering the application of § 28-1213(7) specifically to dry ice bombs, the Nebraska Supreme Court has considered the destructive device statute on at least three occasions. However, all of these cases arose prior to the 2002 amendment that we discuss below.

In *State v. Casados*, 193 Neb. 28, 225 N.W.2d 267 (1975), the defendant was charged with possession of concealed weapons and of a combination of parts intended for use in converting a device into a destructive device—a Molotov cocktail—and convicted on the destructive device charge. The items constituting the combination of parts for a destructive device were found in his vehicle and consisted of candles, rope, pieces of cloth, gallon jugs, and gasoline. One issue addressed by the Nebraska Supreme Court was that of intent. The Supreme Court stated:

> It is evident that simple possession of a completed destructive device designed for use as a weapon is unlawful regardless of intent unless it is one referred to in section 28-1011.22, subdivision (7) (b), R. S. Supp., 1972, possessed under circumstances negating an intent that it should be used as a weapon.

193 Neb. at 30-31, 225 N.W.2d at 269.

In reversing and remanding for a new trial, the *Casados* court concluded:

> The jury should have been instructed in each case that intent is a material element of the offense charged and that before a verdict of guilty could be returned, it was necessary for the State to prove beyond a reasonable doubt that the defendant intended to convert the various items found in his possession into a destructive device. A showing as to where and when the destructive device was to be used is not essential. The failure to clarify the issue of intent was prejudicial.

193 Neb. at 32, 225 N.W.2d at 270.

In his concurring opinion, Justice McCown stated:

> We have now held, however, that an intent to use such combination of parts by converting or assembling them into a destructive device is a material element of the crime here. Under that holding and under the statutory definition of destructive device, a combination of otherwise innocent parts is not a destructive device within the meaning of the statutory presumption unless and until it is found that the defendant had an intent to use such combination of parts by converting or assembling them into a destructive device.

*Id.* at 33, 225 N.W.2d at 270-71.

In a separate concurring opinion, in which Justices Clinton and Brodkey joined, Justice Boslaugh wrote:

> Intent is an element of the offense only where the defendant is charged with unlawful possession of a combination of parts intended for use in creating a destructive device. Where the statutory presumption is relied on the jury should be instructed that the evidence must show the defendant intended to use the parts to create a destructive device or knew that some other party present in the vehicle had such an intent.

*Id.* at 40-41, 225 N.W.2d at 271.

In a dissenting opinion, Justice Spencer stated:

> I agree, intent is irrelevant when an assembled device falls within subdivision (7) (a) of section 28-1011.22, R. S. Supp., 1972. As set out in United States v. Tankersley[, 492 F.2d 962 (7th Cir. 1974)], intent is irrelevant: ". . . when an assembled device falls 'within (1) or (2),' because: the parts are clearly 'designed' to convert the device into a destructive device. When it is equally clear that the end product does not fall within one of those categories, the same is true. When, however, the components are capable of conversion into both such a device and another object not covered by the statute, intention to convert the components into the 'destructive device' may be important." Here, however, the components were not capable of conversion into any object *except* a destructive device, as the testimony set out above clearly indicates.

*State v. Casados*, 193 Neb. 28, 36, 225 N.W.2d 267, 272 (1975).

We observe that the statute in effect at the time *Casados* was decided differed in structure from the statute before us. The relevant portions of the statute in effect at that time, Neb. Rev. Stat. § 28-1011.22 (Cum. Supp. 1972), stated:

(7) Destructive devices shall mean:

(a) Any explosive, incendiary, or poison gas (i) bomb, (ii) grenade, (iii) rocket having a propellant charge of more than four ounces, (iv) missile having an explosive or incendiary charge of more than one-quarter ounce, (v) mine, (vi) booby trap, (vii) Molotov cocktail, or (viii) any similar device, the primary or common purpose of which is to explode and to be used as a weapon against any person or property; or

(b) Any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subdivision (7) (a) of this section and from which a destructive device may be readily assembled. The term destructive device shall not include any device which is neither designed nor redesigned for use as a weapon to be used against persons or property; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordinance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of Section 4684(2), 4685, or 4686 of Title 10 of the United States Code; or any other device which the State Fire Marshal finds is not likely to be used as a weapon, or is an antique; or any other device possessed under circumstances negating an intent that the device be used as a weapon against any person or property.

Thus, the language excluding certain devices was contained only in subsection (7)(b)—the same subsection as that discussing "combination of parts"—strongly suggesting, as the concurring and dissenting opinions in *Casados* recognize, that devices listed in subsection (7)(a) as it then existed would not be affected by the exclusionary language.

In 2002, the statute, already recodified as § 28-1213, was restructured to include the "combination of parts" language under subsection (7)(a)—thereby separating that phrase from the exceptions language (the Legislature had also previously amended

the statute to itemize the exceptions to the definition of "destructive device" in subsection (7)(b), see § 28-1213 (Cum. Supp. 1988)). Prior to the 2002 restructuring, it could be persuasively argued that the exceptions Joseph now cites applied only to the "combination of parts" portion of the definition of "destructive device." See § 28-1213(7)(b) (Cum. Supp. 2000). However, the current statute generally applies the exceptions to all of the types of "destructive device," thereby encompassing within such exceptions the itemized list of devices which includes a "container intentionally caused to . . . mechanically explode by expanding pressure from . . . dry ice." See § 28-1213(7) (Cum. Supp. 2004).

In *State v. Walton*, 246 Neb. 893, 523 N.W.2d 699 (1994), another case decided before the 2002 amendment, the defendant appealed his conviction, claiming in part that there was no evidence to show (1) either that the jars he possessed were designed to be used as weapons or that the primary purpose of the jars was their use as weapons or (2) that the defendant intended to use the jars as weapons. As to the defendant's claims that no evidence was adduced to show that the jars were to be used as weapons, the Nebraska Supreme Court cited to statements by a deputy State Fire Marshal investigator that the jars fit the definition of a Molotov cocktail when filled with gasoline and that a Molotov cocktail is a makeshift incendiary bomb constructed to do harm to individuals or to damage property. The *Walton* court stated, "This testimony is sufficient to meet the standards required by the statute." 246 Neb. at 896, 523 N.W.2d at 701. In support of the defendant's contention that the evidence did not show that he intended to use the jars as weapons, he referred to the testimony of one of his companions on the relevant night who claimed that the jars were to be used as Halloween pranks rather than as weapons. The Supreme Court then cited to *State v. Russell*, 243 Neb. 106, 497 N.W.2d 393 (1993), for the propositions that an appellate court will not set aside a finding of guilty in a criminal case where the finding is supported by relevant evidence and that only where the evidence lacks sufficient probative force as a matter of law may the appellate court set aside a finding of guilty as unsupported by the evidence beyond a reasonable doubt. The Supreme Court stated, "In this case, a jury, by considering the evidence of theft and vandalism, could have found that [the

defendant] intended to use the jars as weapons against property. The evidence of the State was sufficient to sustain the verdict." *State v. Walton*, 246 Neb. at 896, 523 N.W.2d at 701.

Section 28-1213 as it existed prior to the 2002 amendment was again at issue in *State v. Spurgin*, 261 Neb. 427, 623 N.W.2d 644 (2001). In that case, the defendant admitted to police that the items in his possession were bombs or grenades, explained that he was " 'pissed off at the world,' " 261 Neb. at 434, 623 N.W.2d at 650, and yelled his displeasure with people in the city talking about him. Although the defendant argued that he did not want to hurt anyone, the Nebraska Supreme Court stated that the issue regarding for what purpose or intent the devices were constructed was for the jury to determine and that there was sufficient evidence to sustain the defendant's convictions.

Webster's Encyclopedic Unabridged Dictionary of the English Language 1616 (1989) defines "weapon" as follows: "1. any instrument or device for use in attack or defense in combat, fighting, or war, as a sword, rifle, cannon, etc. 2. anything used against an opponent, adversary, or victim . . . ." (Emphasis omitted.) Contrary to *Walton* and *Spurgin*, there is no evidence in the case before us to support a finding that Joseph intended to use the dry ice bombs as weapons. At Joseph's adjudication hearing, the fire inspector testified, "The only purpose for putting dry ice in water in a container like that and sealing it would [be] to make that thing go boom or to explode it, to detonate it, to make it disrupt." This certainly did not amount to evidence that Joseph intended to use the dry ice bombs as weapons.

A similar situation is found in *A.H. v. State*, 794 N.E.2d 1147 (Ind. App. 2003). In that case, a juvenile and others mixed aluminum foil and toilet bowl cleaner inside a plastic 2-liter bottle, placed the bottle into a hole in the juvenile's backyard, went a safe distance from the bottle, and waited for the bottle to explode. A neighbor heard a loud sound and eventually called the police. Police and fire personnel found a melted 2-liter bottle at the scene. A sheriff's deputy called it an " 'acid type bomb' " and explained that when the ingredients are mixed and the cap is placed on the bottle, the bottle will burst due to a buildup of pressure inside the bottle. No people or animals were hurt, and no property, other than the bottle, was destroyed. The State of

Indiana charged the juvenile with possession of a destructive device, and the allegation was found to be true following a delinquency hearing. The relevant statute in that case, Indiana Code Ann. § 35-47.5-2-4 (Lexis 2004), states:

(a) "Destructive device" means:

(1) an explosive, incendiary, or overpressure device that is configured as a:

(A) bomb;

(B) grenade;

(C) rocket with a propellant charge of more than four (4) ounces;

(D) missile having an explosive or incendiary charge of more than one-quarter ($\frac{1}{4}$) ounce;

(E) mine;

(F) Molotov cocktail; or

(G) device that is substantially similar to an item described in clauses (A) through (F);

(2) a type of weapon that may be readily converted to expel a projectile by the action of an explosive or other propellant through a barrel that has a bore diameter of more than one-half ($\frac{1}{2}$) inch; or

(3) a combination of parts designed or intended for use in the conversion of a device into a destructive device.

(b) The term does not include the following:

(1) A pistol, rifle, shotgun, or weapon suitable for sporting or personal safety purposes or ammunition.

(2) A device that is neither designed nor redesigned for use as a weapon.

(3) A device that, although originally designed for use as a weapon, is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device.

(4) A surplus military ordnance sold, loaned, or given by authority of the appropriate official of the United States Department of Defense.

The juvenile argued that the evidence did not establish that the bottle was a bomb or that it was designed as a weapon. The Indiana appellate court concluded that the bottle used by the juvenile qualified as an overpressure device under the statute defining an overpressure device because it was a container filled

with chemicals that generated an expanding gas. Thus, the court reasoned that the Indiana General Assembly had chosen to regulate, in some manner, the type of device used by the juvenile, but expressed concern with regard to whether the general assembly intended that the bottle actually used by the juvenile be categorized as a " 'destructive device.' " *A.H. v. State*, 794 N.E.2d 1147, 1150 (Ind. App. 2003).

For the sake of argument, the court assumed that the bottle was a bomb, but it stated that the bomb would not be a " 'destructive device' " if it was not designed or redesigned as a weapon. *Id.* The court stated:

> In this case, the evidence is clear that the boys did not intend that the bottle be used against another person or an animal. While it is possible that the bottle could have potentially been used to combat or contend against another person or animal, an item may only be classified as a destructive device if it was designed or redesigned for that purpose. Here, there is no evidence from which the juvenile court could have concluded that the bottle was designed to be used against a person or animal. Rather, the evidence established that the bottle was not a weapon because the boys took precautions to make sure that no one was hurt and that nothing was damaged other than the bottle itself. Because the device was not designed or redesigned for use as a weapon, it cannot be held to be a "destructive device" and consequently, the possession and use of the bottle could not properly result in a violation of [the Indiana Code].

(Emphasis omitted.) *Id.* at 1150-51. The Indiana court also cautioned:

> This is not to say that the self-serving testimony from a party that he did not intend to use a device as a weapon precludes the consideration that it was a weapon and could be a destructive device. In this case, the facts established that the boys were not using this bottle as a weapon. Had the facts shown that they attempted to injure someone with it, or were it of such a size or nature that someone was most likely to be hurt through its use, that action would be viewed differently.

*Id.* at 1151 n.6.

Another juvenile case considering a destructive device statute is *In Interest of T.C.*, 573 So. 2d 121 (Fla. App. 1991). In that case, the juvenile was arrested for possession of a hoax bomb after an officer discovered a brass pipe with one brass cap and one plastic cap in the juvenile's automobile along with two taped bundles of firecrackers and a dozen shotgun shells. Although the bomb was not a destructive device, the officers testified that they thought the pipe might be a bomb and that the juvenile stated that it looked like a pipe bomb. The *In Interest of T.C.* court set forth the statute defining a " 'destructive device,' " 573 So. 2d at 122, which statute included a provision that a destructive device does not include a device not designed, redesigned, used, or intended for use as a weapon. See Fla. Stat. Ann. § 790.001(4) (West 2000). The Florida appellate court stated:

> In order to be a hoax bomb, the device in question must be an imitation of a destructive device. Thus, it must imitate a device which is *intended* to be a weapon. In other words, the maker or possessor of a hoax bomb must *intend* the device to be perceived as a weapon or the imitation must be used or designed to be used and perceived as a weapon. Contrary to the state's position in the trial court, the intention of the perpetrator is an essential element of the crime.

573 So. 2d at 123. The court therefore held that "a violation of the statute requires that the perpetrator design, intend or use the imitation destructive device in such a way as to [make it] appear to be a weapon." *Id.* at 124.

The term "destructive device" is used in two statutes of the U.S. Code: in a provision of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 921(a)(4) (Supp. II 2002), and in the National Firearms Act, as amended by the Gun Control Act of 1968, 26 U.S.C. § 5845(f) (2002). Section 921(a)(4) provides in pertinent part:

> The term "destructive device" means—
> (A) any explosive, incendiary, or poison gas—
> (i) bomb,
> (ii) grenade,
> (iii) rocket having a propellant charge of more than four ounces,

(iv) missile having an explosive or incendiary charge of more than one-quarter ounce,

(v) mine, or

(vi) device similar to any of the devices described in the preceding clauses;

(B) any type of weapon (other than a shotgun or a shotgun shell which the Attorney General finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and

(C) any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled.

The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10; or any other device which the Attorney General finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting, recreational or cultural purposes.

Section 5845(f) sets forth:

The term "destructive device" means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the

Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10 of the United States Code; or any other device which the Secretary finds is not likely to be used as a weapon, or is an antique or is a rifle which the owner intends to use solely for sporting purposes.

The federal courts have come to a number of different results concerning the definition of "destructive device" and the issue of intent. See Annot., 126 A.L.R. Fed. 597 (1995).

Early on, the Fourth Circuit Court of Appeals stated that whether commercial explosives were covered by the federal statutes was to be determined by the use for which the explosives were intended. *United States v. Morningstar*, 456 F.2d 278 (4th Cir. 1972), *cert. denied* 409 U.S. 896, 93 S. Ct. 135, 34 L. Ed. 2d 153. That court did not view § 5845(f)(3) "as simply creating an affirmative defense," but instead stated that the government would have the burden to prove beyond a reasonable doubt both that the sticks of black powder pellet explosive and the blasting caps at issue in *Morningstar* could have been readily assembled into a bomb and that the defendant intended to convert those materials into a bomb. *Id.* at 281.

The device at issue in *United States v. Dalpiaz*, 527 F.2d 548 (6th Cir. 1975), was a ground-burst projectile simulator which was used primarily by the military in training infantry troops. The defendant argued that it was not a destructive device because it was neither designed nor redesigned for use as a weapon. An expert for the government testified that upon detonation, the device would expel only the cardboard of which it was composed; that it would make a shallow depression in the ground if

detonated on the ground; and that it would probably take off most of a person's hand if detonated while held. This expert further testified that the device was not designed or intended to be used against people or property. In *Dalpiaz*, the Sixth Circuit stated that the evidence was uncontested that the device was not designed as a weapon, that the device was thereby specifically excluded by the relevant statute as being a " 'destructive device,' " and that what the defendant intended to do with the device was irrelevant for the purpose of determining whether it came within the statutory exclusion. 527 F.2d at 551. The court noted that the U.S. House of Representatives' version of the pertinent legislation originally included language about "both design and intent of the user," but that the language concerning the intent of the user was struck from the final version of the bill. *Id.* That court further stated, "The legislative history of the section reveals that the exception is a matter of affirmative defense." *Id.* at 552.

The Ninth Circuit takes a somewhat different stance. In *U.S. v. Fredman*, 833 F.2d 837, 839 (9th Cir. 1987), where the allegedly destructive device was components of commercial explosives, the court stated that "mere components of commercial explosives, absent proof of intent to use such components as a weapon, fail to qualify as a 'destructive device' within the meaning of 26 U.S.C. § 5845. Intent is a necessary element, absent proof of original design or redesign for use as a weapon." The court further stated, "We have adhered to one interpretation of the intent requirement in all prior cases. That interpretation focuses on 'intent to use' rather than on 'intent to convert' for use." *Fredman*, 833 F.2d at 839. In *U.S. v. Ruiz*, 73 F.3d 949 (9th Cir. 1996), *cert. denied* 519 U.S. 845, 117 S. Ct. 130, 136 L. Ed. 2d 79, a case involving stun grenades, the court distinguished the situation from that in *Fredman, supra*, on the basis that § 5845(f)(3) was applicable to components and not to fully assembled devices. The Ninth Circuit reasoned:

> Since "parts" aren't necessarily a weapon, the statute requires intent to use them as a weapon. By contrast here, there is no dispute that the stun grenade is a fully assembled "grenade," § 5845(f)(1)(B); the only question is whether it is, or is not, designed for use as a weapon. We therefore hold that the defendant's intent to use the fully

assembled stun grenades as a weapon is not a necessary element.

*Ruiz*, 73 F.3d at 951.

In *U.S. v. Lussier*, 128 F.3d 1312 (9th Cir. 1997), *cert. denied* 523 U.S. 1131, 118 S. Ct. 1824, 140 L. Ed. 2d 960 (1998), the Ninth Circuit had to determine whether homemade explosive devices were fully assembled devices similar to explosive bombs, grenades, and the like under § 921(a)(4)(A) or were unassembled component parts under § 921(a)(4)(C). Subsection (a)(4)(C) requires that the combination of parts be "designed or intended" to be used in converting something into a bomb or similar device, whereas subsection (a)(4)(A) contains no intent requirement. The court concluded that the homemade devices were fully assembled devices similar to bombs, grenades, et cetera; that they were not socially useful items that could be converted into destructive devices only by intent to use them as weapons; and that proof of intent was not required.

In an 11th Circuit case, *U.S. v. Hammond*, 371 F.3d 776 (11th Cir. 2004), the defendant was charged with making a firearm without first registering, paying tax on, and obtaining the federal Secretary of the Treasury's approval to make the firearm. The " 'firearm' " consisted of a tube approximately 13 inches long, 1½ inches in diameter, and made of 10 layers of industrial grade cardboard. *Id.* at 778. The inside of the tube was filled with smokeless gunpowder and another explosive powder. The ends of the tube were crimped and dipped in liquid candle wax, and the entire tube was reinforced with three layers of tape. A fuse was placed through one of the ends and ran to the center of the tube. Witnesses testified that the defendant had made numerous similar, but smaller, devices and that these devices rarely exploded with more than a " 'pop' " and a minor puff of smoke, but that occasionally, they created a small explosion. *Id.* One of the government's expert witnesses opined that the defendant designed the device, which that witness characterized as a " 'bomb,' " as a weapon based upon the facts that the device was designed to explode and that upon explosion, " '[a]nyone within direct proximity of this device could sustain serious injury or death.' " *Id.* The defendant moved for a judgment of acquittal at the close of the government's case and again at the

close of the evidence, and the court reserved ruling on the motion each time. The case was submitted to a jury, and the jury returned a verdict of guilty. The trial court subsequently ruled on the reserved motion for a judgment of acquittal, and it granted the motion.

On appeal, the 11th Circuit stated, "[A] device that explodes is not covered by the statute merely because it explodes. Statutory coverage depends upon proof that a device is an explosive *plus* proof that it was designed as a weapon." *Id.* at 780. The court recognized that one of the government's experts opined that the device was constructed as a weapon, but it stated:

> [H]e offered no insight as to how he arrived at this conclusion other than that the device would explode and cause damage. It is clearly insufficient proof under the statute to opine that an explosive device is a [sic] designed as a weapon because it is an explosive device. Without some other evidence that a device was specifically designed as a weapon—the plus factor—the statutory requirement that a device be so designed is reduced to surplusage.

*Id.*

The court reasoned that unlike the case if a pipe bomb made of galvanized metal or a cardboard tube filled with nails were to be detonated, there was no evidence that had the defendant's device exploded, anything other than bits of cardboard would have been propelled. Further, the defendant's device was not designed to expel projectiles; nor did it contain incendiary material, poison gas, radioactive material, et cetera. The court stated that "the critical inquiry is whether the device, as designed, has any value other than as a weapon" and cautioned that "the presence of design features that eliminate any claimed entertainment or other benign value supports a finding that the device was designed as a weapon." *U.S. v. Hammond*, 371 F.3d 776, 781 (11th Cir. 2004), citing *U.S. v. Johnson*, 152 F.3d 618 (7th Cir. 1998). The defendant's argument was that he constructed a firecracker and not a weapon, and the 11th Circuit quoted *Johnson, supra,* for support that a firecracker has a useful social and commercial purpose. The *Hammond* court therefore concluded that "no reasonable juror could have found beyond a reasonable doubt from the evidence that [the defendant's] device was not

designed for its pyrotechnic qualities, but rather was designed as a weapon." 371 F.3d at 782.

We include the above sampling of various federal court cases to demonstrate the difficulty among the federal courts in handling "destructive device" cases. Incidentally, the structure of the federal statutes remains very similar to that of § 28-1213 as it existed prior to the 2002 amendment; e.g., the provisions of § 5845(f) addressing intent are included only in the section thereof relating to "combination of parts." Cf. § 921(a)(4). Because, as we discussed above, the Nebraska Legislature restructured § 28-1213 —which restructuring in effect allowed for the exemptions to be applied to devices described in both subsection (7)(a)(i) and subsection (7)(a)(ii) thereof—we must assume that the Legislature intended to do so and must apply the statute accordingly. Thus, we must look to see whether the circumstances surrounding a device as defined in § 28-1213(7)(a)(i) or (ii) negate an intent that such device be used as a weapon, or whether the devices at issue in the instant case were designed or redesigned for use as weapons.

We observe that legislative bodies from other states have found ways to criminalize dry ice bombs without necessitating an inquiry concerning the possessor's intent. The California Penal Code defines " 'destructive device' " to include "[a]ny sealed device containing dry ice . . . or other chemically reactive substances assembled for the purpose of causing an explosion by a chemical reaction." Cal. Penal Code Ann. § 12301(a)(6) (West 2000). The South Carolina statute providing definitions for terms included in that state's chapter on offenses promoting civil disorder reads:

(4) "Destructive device" means:

(a) a bomb, incendiary device, or any thing that can detonate, explode, be released, or burn by mechanical, chemical, or nuclear means, or that contains an explosive, incendiary, poisonous gas, or toxic substance (chemical, biological, or nuclear materials) including, but not limited to, an incendiary or over-pressure device, or any other device capable of causing damage, injury, or death;

(b) a bacteriological weapon or biological weapon; or

(c) a combination of any parts, components, chemical compounds, or other substances, either designed or intended for use in converting any device into a destructive device which has been or can be assembled to cause damage, injury, or death.

. . . .

(11) "Over-pressure device" means a container filled with an explosive gas or expanding gas or liquid which is designed or constructed so as to cause the container to break, fracture, or rupture in such a manner which is capable of causing death, bodily harm, or property damage, and includes, but is not limited to, a chemical reaction bomb, an acid bomb, a caustic bomb, or a dry ice bomb.

S.C. Code Ann. § 16-8-10 (West 2003 & Cum. Supp. 2004).

In Tennessee, the statutory meaning of the term "[e]xplosive weapon" includes, inter alia, "[a]ny sealed device containing dry ice or other chemically reactive substances for the purposes of causing an explosion by a chemical reaction." Tenn. Code Ann. § 39-17-1301(3)(B)(ii) (2003). As a final example, Arizona law provides:

"Prohibited weapon" means, but does not include fireworks imported, distributed or used in compliance with state laws or local ordinances, any propellant, propellant actuated devices or propellant actuated industrial tools that are manufactured, imported or distributed for their intended purposes or a device that is commercially manufactured primarily for the purpose of illumination, including any of the following:

(a) Explosive, incendiary or poison gas:

(i) Bomb.

(ii) Grenade.

(iii) Rocket having a propellant charge of more than four ounces.

(iv) Mine.

. . . .

(f) Breakable container that contains a flammable liquid with a flash point of one hundred fifty degrees Fahrenheit or less and that has a wick or similar device capable of being ignited.

(g) Chemical or combination of chemicals, compounds or materials, including dry ice, that are placed in a sealed or unsealed container for the purpose of generating a gas to cause a mechanical failure, rupture or bursting of the container.

(h) Combination of parts or materials that is designed and intended for use in making or converting a device into an item set forth in subdivision (a) or (f) of this paragraph.

Ariz. Rev. Stat. Ann. § 13-3101(A)(7) (West Cum. Supp. 2004).

Neb. Rev. Stat. § 43-279(2) (Reissue 2004) requires proof beyond a reasonable doubt to adjudicate a juvenile as a person described by § 43-247(1), (2), (3)(b), or (4). We have reviewed the issues utilizing our de novo standard. But, even viewing the evidence in the light most favorable to the State, there is nothing in the circumstances to suggest that Joseph intended to use the dry ice bombs as weapons against persons or property or designed or redesigned the devices as weapons. The State failed to prove the allegations of the petition beyond a reasonable doubt, and thus, we must remand the cause with directions to dismiss the petition. Of course, the interim order must also be reversed. Because of our resolution of this issue, we need not address Joseph's remaining assignments of error. See *State v. King*, 269 Neb. 326, 693 N.W.2d 250 (2005) (appellate court is not obligated to engage in analysis not needed to adjudicate case and controversy before it).

## CONCLUSION

The decisions of the separate juvenile court adjudicating Joseph and imposing interim requirements are reversed, and the matter is remanded to the lower court with directions to dismiss the juvenile petition against Joseph in this case.

REVERSED AND REMANDED WITH DIRECTIONS.